**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Vonda Nadler, | No. CV-20-00085-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| City of Tucson, et al., | |
| Defendant. | |

Pending before the Court is Defendant City of Tucson's Motion for Summary Judgment. (Doc. 60.) Plaintiff filed a Response (Doc. 66) and Defendant replied (Doc. 70). For the reasons set forth below, the Motion will be granted.

## I. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102–

03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the Court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Pure questions of law, where there is no disputed issue of fact, are appropriate for summary judgment. *Schrader v. Idaho Dep't of Health & Welfare*, 768 F.2d 1107, 1110 (9th Cir. 1985). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. "[T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* (internal citation omitted). In its analysis, the Court must accept the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The Court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

1

2

## II. Factual Background

Plaintiff Vonda Nadler ("Plaintiff" or "Nadler") is employed by Defendant City of Tucson ("Defendant" or "the City") as a Public Safety Dispatch Specialist II. (Doc. 61 ¶ 1.)[1] In her position, Nadler answers calls and dispatches the appropriate response units to police, fire, and medical 911 calls. (*Id.* ¶ 2.) Nadler completed the 18-month training for this position in 2010. (*Id.* ¶ 3.) Nadler is a full-time, hourly employee and her schedule follows what is known as a "3/4 schedule," which is comprised of one week of three 12-hour shifts (36 hours total), followed by one week of four 12-hour shifts (48 hours total). (*Id.* ¶¶ 5-6.) The 36-hour week is considered four hours short of the 40-hour requirement for full time, while the 48-hour week is considered 40 hours at the regular hourly pay rate plus 8 hours of overtime pay. (*Id.* ¶¶ 7-8.) An employee working this schedule, including Nadler, has the option of either applying 4 of the 8 extra hours from the 48-hour week to the 36-hour week in order to reach the hourly full-time requirement for both weeks, or, alternatively, be paid overtime for the extra 8 hours from the 48-hour week and work additional hours to make up for the 4 additional hours needed to make the 36-hour week full-time. (*Id.* ¶¶ 9-10.)

Separate from and in addition to the 3/4 schedule, employees have the option of signing up for voluntary overtime. (*Id.* ¶ 11.) Because the City's emergency response services are short-staffed, essentially unlimited overtime is available to employees. (*Id.* ¶¶ 4, 12.) Employees have three ways to sign up for voluntary overtime. (*Id.* ¶ 13.) An employee can (1) sign up in advance for voluntary overtime hours using the Telestaff program ("ASUO" shifts); (2) respond to very short notice voluntary overtime shifts ("VSNO" shifts), which apply to same-day or next-day shifts; or (3) inform her supervisor of her availability and ask whether there are shifts available during that period. (*Id.* ¶¶ 15-17.) Several City Administrative Directives ("AD") apply to Nadler's position, including (1) Rules of Conduct; (2) Employee Leaves; (3) Family and Medical Leave; (4)

---

[1] Plaintiff did not raise any objections to Defendant's Statement of Facts. (Doc. 68.) Accordingly, all facts noted herein are taken from Defendant's Statement of Facts, unless otherwise noted.

1    Reasonable Accommodation; and (5) Anti-Harassment. (*Id.* ¶¶ 18-32.) These Directives
2    contain the City's policies regarding each topic, and each applies to Nadler's position.
3    (*Id.*)

4        Nadler has three health conditions that underlay her Family Medical Leave Act
5    (FMLA) leave requests from 2018 through 2021—Meniere's Disease, Fibromyalgia, and
6    Lupus. (*Id.* ¶ 33.) Meniere's Disease is an inner ear disease that causes ringing in the ears
7    and impacts an individual's hearing ability. (*Id.* ¶ 35.) Nadler experiences flares of
8    Meniere's Disease about once per week. (*Id.* ¶ 37.) Fibromyalgia is a nerve disorder that
9    causes pain in the muscles, which Nadler mostly experiences as pain in the shoulders and
10   neck, and headaches. (*Id.* ¶ 38.) She experiences flares of fibromyalgia about once per
11   month, and sometimes experiences flares of Meniere's Disease and fibromyalgia
12   simultaneously. (*Id.* ¶ 39-40.) Lupus is an auto-immune disease that causes symptoms
13   including pain, body aches, and cognitive issues including difficulty remembering and
14   focusing. (*Id.* ¶ 41-42.) Nadler experiences lupus flares about once per month. (*Id.* ¶ 43.)

15       This case arises out of Nadler's attempted use of FMLA leave to excuse her
16   health-related absences from voluntary overtime shifts. Nadler has stated "FML" when
17   calling in absent on voluntary overtime shifts, and those absences are recorded as "FML"
18   on the City's attendance spreadsheet. (*Id.* ¶ 50.) However, the City maintains, and Nadler
19   admits, that absences from voluntary overtime shifts are not covered under the FMLA.
20   (*Id.* ¶ 51.) Specifically, Nadler testified that when an employee calls in absent on a
21   voluntary overtime shift, no leave balances are applied to those absences; this is
22   consistent with City policy. (*Id.*; Doc. 60 at 7.)  The City has never denied Nadler FMLA
23   leave for absences from her regular 3/4 schedule. (*Id.* ¶ 52.)

24       As a result of her repeated unscheduled absences from voluntary overtime shifts,
25   the City initially restricted Nadler from signing up for voluntary overtime shifts on three
26   occasions: (1) a 60-day restriction on signing up for ASUO shifts, with no restriction on
27   VSNO shifts, in March 2017; (2) a three-month restriction on signing up for ASUO
28   shifts, with no restriction on VSNO shifts, in April 2018; and (3) a three-month

restriction on signing up for ASUO shifts and a two-month restriction on signing up for VSNO shifts, in November 2018. (*Id.* ¶¶ 55-65.)  These restrictions were accompanied by "special evaluations" documenting the issue of Nadler's absences from scheduled overtime shifts and how this negatively impacted the emergency services department, which was already critically short-staffed. (*Id.*) On May 23, 2019, Nadler emailed one of her supervisors, Geoff Kuhn, inquiring whether her ability to sign up for overtime shifts would be restricted again due to having to call out "because of FML reasons." (*Id.* ¶ 66.) Mr. Kuhn responded that the restrictions on Nadler's overtime signups were due to her short-notice absences from voluntary overtime shifts, which prevented others from signing up for those shifts during an already understaffed time period. (*Id.* ¶ 67.) Mr. Kuhn clarified that FMLA does not apply to voluntary overtime. (*Id.*)

On June 25, 2019, Nadler filed a charge with the Civil Rights Division of the Arizona Attorney General's Office and the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶¶ 68-70.) On July 19, 2019, following its receipt of the charge, the City sent Nadler a reasonable accommodation packet for completion, but she did not complete it. (*Id.* ¶¶ 71-76.) Nadler's annual evaluation in 2019 identified her absences from voluntary overtime shifts as an area needing improvement. (*Id.* ¶¶ 77-82.) After Nadler informed her supervisor that the absences were "not something [she] can work on" and that her conditions were "going to get worse with time, not better," the evaluation was revised to omit the attendance-related statements. (*Id.*)

In September 2019, Nadler received another "special evaluation" that restricted her ability to sign up for ASUO shifts for a six-month period. (*Id.* ¶¶ 83-85.) Her ability to sign up for VSNO was not restricted and she worked VSNO shifts during this period. (*Id.*)

Nadler claims her three medical conditions constitute a disability under the Americans with Disabilities Act (ADA). (*Id.* ¶ 34.) However, she testified at her deposition that there was no reasonable accommodation the City could provide to accommodate her needs when she is experiencing a flare-up of Meniere's, lupus, or

fibromyalgia, other than allowing her to use FMLA leave for absences from voluntary overtime shifts. (*Id.* ¶¶ 86-92.) She testified that she is not able to perform the essential functions of her job when she is having a flare-up that requires her to be absent. (*Id.*) Nadler claims that the special evaluations and restrictions on her ability to sign up for ASUO shifts were in retaliation for her attempt to use FMLA leave for absences from voluntary overtime shifts. (*Id.* ¶¶ 96-97.)

## III.   Discussion

Defendant moves for summary judgment on all of Plaintiff's claims. First, Defendant argues that Plaintiff's claim that the City interfered with her ability to take FMLA-protected leave fails because (1) FMLA-protected leave does not apply to absences from voluntary overtime shifts and (2) Nadler cannot prove that the special evaluations and temporary restrictions on her ability to sign up for voluntary overtime caused her economic harm or were "adverse employment actions" within the meaning of the FMLA. (Doc. 60 at 2.) Second, Defendant argues that Plaintiff's claim that the City denied her a reasonable accommodation under the ADA fails because (1) Nadler is not a "qualified individual" within the meaning of the ADA; (2) Nadler's suggested accommodation of absenteeism from voluntary overtime shifts is not reasonable; and (3) Nadler failed to engage in the interactive process to determine an accommodation. (*Id.* at 10-16.) Third, Defendant argues that Plaintiff's ADA disparate treatment claim fails because she is not qualified and suffered no adverse employment action within the meaning of the statute. (*Id.* at 16-18.) Fourth, Defendant argues that Plaintiff's hostile environment/harassment claim under the ADA fails because no such cause of action has been recognized in the Ninth Circuit and, even if it had, she is not a qualified individual with a disability within the meaning of the statute. (*Id.* at 18-19.) Lastly, Defendant argues that Plaintiff's ADA retaliation claim fails because she suffered no adverse action, let alone one connected to a protected activity. (*Id.* at 20-21.)[2]

---

[2] Defendant argues that Plaintiff's disability-based Arizona Civil Rights Act (ACRA) claims are subject to the same standards as the ADA claims and fail for the same reasons. (Doc. 60 at 21.)

1    As Plaintiff does not contest Defendants' Statement of Facts, the Court finds that

2    there is no genuine dispute as to any material fact and thus the question before the Court

3    is whether Defendant is entitled to judgment as a matter of law on any or all of Plaintiff's

4    claims.

5              **a.  FMLA claims**

6    "The FMLA provides job security to employees who must be absent from work

7    because of their own illnesses, to care for family members who are ill, or to care for new

8    babies." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1119 (9th Cir. 2001) (citing

9    29 U.S.C. § 2612). The FMLA "creates two interrelated, substantive employee rights:

10   first, the employee has a right to use a certain amount of leave for protected reasons, and

11   second, the employee has a right to return to his or her job or an equivalent job after

12   using protected leave." *Id*. at 1122 (citing 29 U.S.C. §§ 2612(a), 2614(a)). It is "unlawful

13   for an employer to 'interfere with, restrain, or deny the exercise of or the attempt to

14   exercise, any right provided' by the Act." *Id*. (citing 29 U.S.C. § 2615(a)(1)). Interference

15   "includes refusing to authorize FMLA leave, discouraging the use of such leave, and

16   changing the essential functions of the job in order to preclude the taking of leave."

17   *Aguirre v. California*, No. 16-CV-05564-HSG, 2019 WL 3544006, at *2 (N.D. Cal. Aug.

18   2, 2019), *aff'd*, 842 F. App'x 91 (9th Cir. 2021) (citing 29 C.F.R. § 825.220(b)).

19   Furthermore, "employers cannot use the taking of FMLA leave as a negative factor in

20   employment actions, such as . . . disciplinary actions." *Bachelder*, 259 F.3d at 1122

21   (citing 29 C.F.R. § 825.220(c)). An adverse employment action is one that "is reasonably

22   likely to deter employees from engaging in protected activity." *Garmon v. Plaid Pantries*,

23   No. 3:12-CV-1554-AC, 2013 WL 3791433, at *19 (D. Or. July 19, 2013) (citing

24   *Bachelder*, 259 F.3d at 1124). Such actions can include, depending on the circumstances,

25   "termination, dissemination of an unfavorable employment reference, issuance of an

26   undeserved negative performance review, refusal to consider for promotion, exclusion

27   from meetings, seminars and positions providing eligibility for salary increases, denial of

28   secretarial support, a more burdensome work schedule, and a lateral transfer." *Id*.

1  (internal citations omitted). A plaintiff must also "establish that he was economically

2  prejudiced as a result of the employer's actions." *Id.*

3       To establish a prima facie case of FMLA interference, a plaintiff must establish

4  that "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the

5  FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of

6  his intent to take leave, and (5) his employer denied him FMLA benefits to which he was

7  entitled." *Aguirre*, 2019 WL 3544006, at *2 (quoting *Escriba v. Foster Poultry Farms*,

8  *Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014)); *see also Bachelder*, 259 F.3d at 1125 (the

9  FMLA is not implicated and does not protect an employee against disciplinary action

10 based on absences not taken for one of the reasons enumerated in the Act); *Marchisheck*

11 *v. San Mateo County*, 199 F.3d 1068 (9th Cir. 1999) (a terminated employee had no

12 cause of action under the FMLA because the absences for which she was fired were not

13 protected by the Act).

14      Applicable regulations state that the FMLA does not apply to voluntary overtime

15 work, even if absences from such work are taken due to an FMLA-qualifying reason:

16           (c) Overtime. If an employee would normally be required to
17           work overtime, but is unable to do so because of a FMLA–
             qualifying reason that limits the employee's ability to work
18           overtime, the hours which the employee would have been
             required to work may be counted against the employee's
19           FMLA entitlement. In such a case, the employee is using
             intermittent or reduced schedule leave. For example, if an
20           employee would normally be required to work for 48 hours in
             a particular week, but due to a serious health condition the
21           employee is unable to work more than 40 hours that week, the
22           employee would utilize eight hours of FMLA–protected leave
             out of the 48–hour workweek, or one-sixth (1/6) of a week of
23           FMLA leave. **Voluntary overtime hours that an employee
             does not work due to an FMLA–qualifying reason may
24           not be counted against the employee's FMLA leave
25           entitlement.**

26 29 C.F.R. § 825.205(c) (emphasis added).

27

28

The City's AD 2.01-7C, Family and Medical Leave, requires that "utilization of FML runs concurrent with all other leaves" and "an employee is required to use all paid leave benefits . . . in the following order: Sick Leave, Vacation Leave, Compensatory Time, and Floating Birthday/Holiday. All paid leave benefits run concurrently with FML (continuous or intermittent) and must be exhausted before Leave Without Pay (LWOP) can be approved." (Doc. 60 at 7; Doc. 61 ¶ 25.) The parties do not dispute that the City does not apply paid leave benefits to absences from voluntary overtime shifts. (*Id.*)

Because FMLA leave does not apply to absences from voluntary overtime shifts, consistent with the City policy not to apply paid leave to those absences, Nadler's FMLA claim fails as a matter of law. Furthermore, because absences from voluntary overtime shifts are not FMLA-protected, any adverse employment actions that Nadler alleges cannot be connected to those absences. Furthermore, Nadler has not demonstrated any economic harm resulting from the restrictions on her ability to sign up for voluntary overtime shifts. Accordingly, summary judgment will be granted to Defendant on this claim.

### b.  ADA claims

#### i.  Reasonable accommodation

"The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business." *Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (citing 42 U.S.C. § 12112(b)(5)(A)). Reasonable accommodations may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). The ADA does not explicitly define the term "reasonable accommodation," *see* 42 U.S.C. § 12111(9);

however, the EEOC regulations have defined it as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). The Ninth Circuit has similarly held that a "reasonable accommodation must be effective, in enabling the employee to perform the duties of [her] position." *Ravel v. Hewlett-Packard Enter., Inc.*, 228 F. Supp. 3d 1086, 1093 (E.D. Cal. 2017) (citing *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001)).

A "qualified individual" within the meaning of the ADA is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m). "Essential functions" are "fundamental job duties of the employment position the individual with a disability holds or desires" and do not include "marginal functions of the position." 29 C.F.R. § 1630.2(n). A function may be essential due to a "limited number of employees available" or being "highly specialized." *Id*.

Courts have found that attendance is an "essential function" of jobs that involve life-or-death situations, answering urgent phone calls, and those where staffing is short. *See Guzman v. Brown Cnty.*, No. 15-CV-0215, 2016 WL 7839143, at *6 (E.D. Wis. Sept. 1, 2016), *aff'd*, 884 F.3d 633 (7th Cir. 2018) (finding that attendance was an essential function of the job where, without plaintiff's attendance, "[emergency] calls do not get answered, emergency services do not get dispatched, and the job does not get done. [Plaintiff's] attendance is absolutely required at work, or else someone else has to perform her job for her."); *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1239 (9th Cir. 2012) ("Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee who does not come to work cannot perform any of his job functions, essential or otherwise.") (internal citations omitted); *Mcclelland v. Permanente Med. Grp., Inc.*, No. 2:11-CV-1224-LKK-EFB, 2013 WL

1195032, at *2 (E.D. Cal. Mar. 22, 2013) (attendance essential where understaffing compromises patient care). As courts have consistently found that attendance at work is an essential function, they have also found that individuals with disabilities that prevent them from coming to work are not "qualified individuals" under the ADA. *See Samper*, 675 F.3d at 1237 ("[I]f one is not able to be at work, one cannot be a qualified individual."); *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 489–90 (7th Cir. 2014) ("A plaintiff whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes.").

"The ADA and the FMLA have divergent aims, operate in different ways, and offer disparate relief. An employee seeking FMLA leave is by nature arguing that he cannot perform the functions of the job, while an employee requesting a reasonable accommodation communicates that he can perform the essential functions of the job." *Smith v. Cook Cnty.*, No. 17 C 7609, 2019 WL 1515007, at *5 (N.D. Ill. Apr. 8, 2019) (internal citation omitted).

As an initial matter, the Court finds that attendance at voluntary overtime shifts for which an employee has signed up is an essential function of Nadler's position. The uncontroverted testimony indicates that there is a shortage of emergency call takers, calls must be answered for emergency services to be timely dispatched, and an employee's failure to show up for a scheduled overtime shift precludes any other employee from taking that shift. This leaves the City short-staffed during a time of critical need, which results in a seriously detrimental impact to the functioning of those services. Neither party disputes these facts and a finding that attendance at scheduled voluntary overtime shifts is an essential function is consistent with the findings of other courts analyzing similar fact patterns. Although the overtime shifts at issue here are voluntary, once an employee has signed up, the facts show that attendance is essential.

Nadler testified at her deposition that when she experiences flares of Meniere's, fibromyalgia, or lupus, she is unable to attend voluntary overtime shifts and must "lay in

bed and wait it out." (Doc. 60 at 12; Doc. 61 ¶ 36.) Nadler further testified that there is no accommodation the City could provide that would enable her to attend work during those times. (*Id*.; Doc. 61 ¶¶ 86-89.) Thus, even if Nadler has a qualifying disability within the meaning of the ADA, she is not a "qualified individual" for purposes of the statute because, with or without a reasonable accommodation, she is unable to perform the essential function of in-person attendance at her position during her overtime shifts. The accommodation Nadler suggests, namely, being allowed to apply FMLA leave to absences from voluntary overtime shifts, does not qualify as a "reasonable accommodation" within the meaning of the statute because it does not enable her to perform the essential functions of her job. Furthermore, such an accommodation would be inconsistent with the dictates of both the FMLA and the ADA, as the FMLA protects leave taken due to an inability to perform a job, while the ADA requires reasonable accommodations to allow employees to work. Nadler appears to overlook this distinction in arguing that FMLA-protected leave should be a reasonable accommodation. Because there is no reasonable accommodation that would enable Nadler to perform the essential function of attending ASUO shifts once she has signed up for them, summary judgment will be granted to Defendant on this claim.

### ii. Disparate treatment

The ADA provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." *Johnson v. Evangelical Lutheran Good Samaritan Soc'y*, No. CV-04-209-ST, 2005 WL 2030834, at *7 (D. Or. Aug. 23, 2005) (citing 42 USC § 12112(a)). "To establish a prima facie case of employment discrimination under the ADA, the plaintiff must prove three elements: (1) the plaintiff is disabled within the meaning of the ADA; (2) the plaintiff is a qualified individual able to perform the essential functions of the job, either with or without reasonable accommodations; and (3) his employer terminated him

1    [or took other adverse action] because of his disability." *Id.* (citing *Nunes v. Wal–Mart*

2    *Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999) (citation omitted)); *see also Sanders v.*

3    *Arneson Prod., Inc.*, 91 F.3d 1351, 1353 (9th Cir. 1996) ("To state a prima facie case

4    under the ADA, a plaintiff must prove that he is a qualified individual with a disability

5    who suffered an adverse employment action because of his disability.").

6          As discussed above in Section III(b)(ii), Plaintiff is not a qualified individual for

7    purposes of the ADA because she is not able to perform the essential function of

8    attending voluntary overtime shifts for which she has signed up, either with or without a

9    reasonable accommodation. Therefore, Plaintiff has not stated a prima facie disparate

10    treatment claim and summary judgment will be granted to Defendant on this claim.

11                    iii.   <u>Hostile environment and harassment</u>

12          In *Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003), the Ninth Circuit

13    Court of Appeals explicitly declined to find a basis for a hostile work environment claim

14    in the ADA, specifically in the portion of the statute stating that "[n]o covered entity shall

15    discriminate against a qualified individual on the basis of disability in regard to job

16    application procedures, the hiring, advancement, or discharge of employees, employee

17    compensation, job training, and other terms, conditions, and privileges of employment."

18    42 U.S.C. § 12112(a). Because the *Brown* court found no statutory source for a claim of

19    harassment or hostile work environment in the ADA, at least one district court in the

20    Ninth Circuit has declined to recognize such a claim. *See King v. C&K Mkt., Inc.*, No.

21    216CV00559TLNCMK, 2018 WL 934551, at *5 (E.D. Cal. Feb. 15, 2018). However,

22    other circuits have recognized such claims as actionable under the ADA. *See Wynes v.*

23    *Kaiser Permanente Hosps.*, 936 F. Supp. 2d 1171, 1185 (E.D. Cal. 2013) (citing cases).

24    Were the Ninth Circuit to recognize such a claim under the ADA, a plaintiff would likely

25    have to show that "(1) she is a qualified individual with [a] disability; (2) she suffered

26    from unwelcome harassment; (3) the harassment was based on her disability or a request

27    for accommodation; (4) the harassment was sufficiently severe or pervasive to alter the

28    conditions of her employment and to create an abusive working environment; and (5)

Defendants knew or should have known of the harassment and failed to take prompt remedial action." *Wynes*, 936 F. Supp. 2d at 1185 (citing *Walton v. Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir.1999)).

Thus, even if the Ninth Circuit had recognized a harassment or hostile work environment claim under the ADA, which it has not, Plaintiff has not shown that she is a qualified individual with a disability, as discussed above in Sections III(b)(ii)-(iii). As a result, she has failed to state the first element of a prima facie claim for hostile work environment or harassment under the ADA. Summary judgment will be granted to Defendant on this claim.

iv.  Retaliation

To establish a prima facie case of retaliation under the ADA, a plaintiff must show by a preponderance of the evidence that "(1) he engaged in protected activity; (2) he was subject to adverse action; and (3) a causal link between the protected activity and the adverse action." *Nelson v. Hibu Inc.*, No. CV-13-0956-TUC-DCB, 2018 WL 10246973, at *7 (D. Ariz. Feb. 16, 2018), *aff'd*, 754 F. App'x 643 (9th Cir. 2019) (citing *Brown*, 336 F.3d at 1187). "When analyzing the elements of an ADA retaliation claim, it is appropriate to look to Title VII cases for guidance." *Id.* (citing *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 & n.5 (9th Cir. 2004)).

A protected activity "includes opposing any act or practice by the employer that violates the ADA and pursuing rights guaranteed by the statute like requesting a reasonable accommodation." *LeBarron v. Interstate Grp., LLC*, 529 F. Supp. 3d 1163, 1173 (D. Nev. 2021) (citing *Pardi*, 389 F.3d at 849); *see also Pardi*, 389 F.3d at 850 ("Pursuing one's rights under the ADA constitutes a protected activity.").

Under the ADA, an adverse action is one that is "reasonably likely to deter [individuals] from engaging in protected activity." *Nelson*, 2018 WL 10246973 at *7 (citing *Pardi*, 389 F.3d at 850). "Adverse action must be sufficiently material, i.e., it must be 'non-trivial' in nature." *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). "As to causation, a plaintiff must prove, by a preponderance of the

1    evidence, that there is a causal link between his protected activity and an adverse action."

2    *Id*. "[L]iability only arises when adverse action was taken 'because' the plaintiff engaged

3    in protected activity." *Id*. (citing 42 U.S.C. § 12203(a)). "The adverse action must be

4    based on a retaliatory motive." *Id*.

5          Nadler alleges that her "repeated efforts to seek redress through internal

6    communications represent protected conduct." (Doc. 66 at 22.) However, she makes only

7    vague allegations regarding the causal connection between that conduct and the alleged

8    adverse actions. Nadler does not explicitly allege that her efforts to seek redress for the

9    perceived discrimination against her led to or resulted in adverse actions against her.

10   Rather, the gravamen of her complaint is that the adverse actions (i.e., restricted ability to

11   sign up for voluntary overtime shifts and negative performance reviews) were the result

12   of her unplanned absences from voluntary overtime shifts. However, such absences do

13   not constitute protected conduct for purposes of an ADA retaliation claim. As Nadler has

14   failed to show, or even allege, a causal link between protected conduct and adverse

15   actions, her retaliation claim fails as a matter of law. Accordingly, summary judgment

16   will be granted to Defendant on this claim.

17                         **c.  ACRA claims**

18         The "ADA standards for disability discrimination claims apply to similar claims

19   brought under the Arizona Civil Rights Act ("ACRA"), A.R.S. § 41–1463, as the ACRA

20   is modeled after federal employment discrimination laws." *Whitmire v. Wal-Mart Stores*

21   *Inc.*, 359 F. Supp. 3d 761, 792 (D. Ariz. 2019) (citing *Larson v. United Nat. Foods W.,*

22   *Inc.*, No. CV-10-185-PHX-DGC, 2011 WL 3267316, at *3 (D. Ariz. July 29, 2011)); *see*

23   *also Ransom v. State of Arizona Bd. of Regents*, 983 F. Supp. 895, 904 (D. Ariz. 1997)

24   ("This Court finds federal case law to be persuasive in interpreting the ACRA because of

25   the similarities between it and the federal antidiscrimination laws"); *Shulock v. City of*

26   *Tucson*, No. CV 07-618 TUC DCB, 2010 WL 2720839, at *6, n. 3 (D. Ariz. July 9, 2010)

27   ("The Court's ADA and Title VII analysis applies to Plaintiff's ACRA claim. If Plaintiff's

28   claim does not survive under federal law, summary judgment is proper as to his state law

claim as well.") Accordingly, because the Court will grant summary judgment on the ADA claims, it will apply the same analysis to the ACRA claims and grant summary judgment for Defendant on the same grounds.

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 60) is **granted**. The above-captioned case is **dismissed**. The Clerk of Court shall enter judgment accordingly and close this case.

Dated this 27th day of December, 2022.

Honorable Rosemary Márquez
United States District Judge